# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHEN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| Wendy Jackson, | : | Case No. 1:11CV2786 |
| Plaintiff, | : | |
| vs. | : | |
| Commissioner of Social Security, | : | **MEMORANDUM DECISION & ORDER** |
| Defendant. | : | |

### I. INTRODUCTION.

Plaintiff seeks judicial review, pursuant to 42 U. S. C. § 405(g), of Defendant's final determination denying her applications for Disabled Widow Benefits (DWB), Disability Insurance benefits (DIB) and Supplemental Insurance Income (SSI). Pending are issues asserted in the cross-Briefs on the Merits (Docket No. 17 & 18). For the reasons that follow, the undersigned Magistrate affirms the Commissioner's decision.

### II. PROCEDURAL BACKGROUND.

On March 25, 2008, Plaintiff filed three applications--a Title II application for DWB, a Title II application for DIB (Docket No. 10, pp. 102-104 of 464) and a Title XVI application for SSI[1] (Docket No. 10, pp. 99-101 of 464)–alleging that she had been disabled since November 15, 1986. The applications

---

[1] The ALJ found that Plaintiff filed the application for SSI on February 5, 2008 (Docket No. 10, pp. 13, 23 of 464).

were denied initially and upon reconsideration (Docket No 10, pp. 70-77, 80-82, 84-89, 91-92 of 464).

Plaintiff requested an administrative hearing and on December 17, 2010, Plaintiff, represented by counsel, and Kevin Yi, a Vocational Expert (VE) appeared and testified at a hearing conducted by ALJ Edmund Round (Docket 10, pp. 43, 96 of 464).  On June 22, 2011, the ALJ concluded:

(1)     Based on the application for a period of disability and DIB filed on March 21, 2008, Plaintiff does not meet the insured status requirements under Section 216(i) of the Act and is not disabled under Section 223(d) of the Act.

(2)     Based on the application for DWB filed on March 21, 2008, Plaintiff is not disabled under Section 202(e) and 223(d) of the Act.

(3)     Based on the application for SSI filed February 5, 2008, Plaintiff is not disabled under Section 1614(a)(3)(A) of the Act.

(Docket No. 10, p. 37).  On October 26, 2011, the Appeals Council denied Plaintiff's request for review rendering the ALJ's decision the final decision of the Commissioner (Docket No. 10, pp. 5-7 of 464).

### III. FACTUAL BACKGROUND.

At the commencement of the administrative hearing, the ALJ questioned Plaintiff about the security guard's report that he detected the smell of alcohol on Plaintiff's person.  Plaintiff admitted that she had a "cup of wine" at 5:00 A.M., approximately four hours before the commencement of the hearing at approximately 9:06 A.M.  Plaintiff assured the ALJ that she had consumed the wine with breakfast and that the alcohol would not affect her ability to comprehend the proceedings (Docket No. 10, pp. 45-49 of 464).

Having completed the ninth grade, Plaintiff's job experience included office clerk work at St. Vincent's Charity Hospital.  There, she filed and copied.  Approximately twice daily, she spent fifteen to twenty minutes escorting clients to their destination (Docket No. 10, pp. 49-52 of 464).

Plaintiff described her impairments:  (1) paralysis of her legs; (2) a displaced hip; (3) frequent urination; (4) alcoholism; and (6) seizures.  Occasionally, her legs cramped so severely that her legs

collapsed.  Initially the pain and cramping had been confined to her ankle.  Eventually, the pain and cramps radiated to the knees and thighs.

One of Plaintiff's hips was larger than the other so she underwent surgery.  Apparently cells extracted from the abnormal growth on Plaintiff's hip were benign.  Because of her hip and leg problems, Plaintiff used a four-pronged cane.  She brought the cane to the hearing but left it on the lower level of the building because it was too heavy to bring upstairs.

Plaintiff suffered from an overactive bladder.  Whether she drank or not, she had to go to the bathroom frequently.  Because of her leg cramps, sitting on the toilet was difficult to maneuver.  Sitting for more than ten minutes affected her ability to get up and walk afterwards (Docket No. 10, pp. 53-54 of 464).  Plaintiff was an alcoholic and she smoked cigarettes.  Unless someone was generous enough to buy her liquor and cigarettes, Plaintiff could abstain from drinking for weeks because she could not afford to purchase liquor (Docket No. 10, p. 54 of 464).

Plaintiff had seizures.  She insisted that they were not related to drinking.  In fact, she had a seizure two days prior to the hearing and she was not drinking.  Her neighbor revived Plaintiff sprinkling her with iced water.  Plaintiff was unable to pinpoint when she had these seizures because she generally lost consciousness and could not remember what occurred just prior to and during the seizure (Docket No. 10, p. 57 of 464).

With respect to her functional abilities, Plaintiff walked to the drugstore that was next to her building; however, walking caused her to become dizzy or lightheaded.  She had no difficulty sitting except that getting up was difficult[2] (Docket No. 10, pp. 55, 56 of 464).

---

[2]

Plaintiff did not offer testimony regarding the extent of her daily activities; however, she explained in the FUNCTION REPORT dated April 8, 2008, that, *inter alia*, she occasionally prepared meals for others in her apartment complex, she fed, bathed and walked her dog, dressed herself while sitting, bathed with assistance, prepared light meals and doing laundry when she felt well, shopped for household and food items once per month, watched

3

Unable to recall the names of the medications she was prescribed or their use, Plaintiff's counsel listed the following medications for which Plaintiff had prescriptions:

1. Hydrocodone, a pain reliever.
2. Nexium®, a stomach neutralizer indicated to maintain symptom resolution and healing of erosive esophagitis, heartburn and symptomatic gastroesophageal reflux disease and gastric ulcers.
3. Lipitor®, a cholesterol lowering medication.
4. Phenytoin or generic Dilantin, an anti-epileptic, anti-convulsant drug.

(Docket No. 10, pp. 56-57 of 464; www.drugs.com/hydrocodone.html; PHYSICIAN'S DESK REFERENCE, 2006 WL 355252 (2006)).

The VE, a professional vocational rehabilitation counselor, considered the exertional level of Plaintiff's substantial gainful activity as a front desk receptionist as sedentary work for which the level of specific vocational preparation included more than one month up to and including three months (Docket No. 10, p. 60 of 464).

In the first hypothetical, the VE responded that the following hypothetical worker could perform Plaintiff's past relevant work:

1. over 50 years of age;
2. with a ninth grade education;
3. with no current relevant vocational training;
4. who could stand and walk for two hours, sit for six hours during an eight-hour workday;
5. who could lift, carry, push or pull a maximum of ten pounds;
6. who was precluded from using ladders, ropes and scaffolds;
7. who could occasionally use stairs and ramps, "steep," kneel, crouch and crawl; and
8. who must avoid concentrated exposure to fumes, odors, dust, gases and poorly ventilated areas.

(Docket No. 10, pp. 60-61 of 464).

---

television every day, read four hours weekly and went to church as often as possible, occasionally spending time with neighbors and keeping medical appointments (Docket No. 10, pp. 115-120 of 464). In a FUNCTION REPORT ADULT THIRD PARTY, dated April 29, 2008, Plaintiff's sister suggested that Plaintiff had no problem with her personal care and that Plaintiff was able to do her laundry and clean with help or encouragement and that Plaintiff spent her day watching television and reading (Docket No. 10, pp. 139-143 of 464). Plaintiff reported to Dr. Wilfredo M. Paras, M. D, during a one-time medical disability examination that she was capable of self care, she could prepare simple meals, read the Bible, watched television and visited her neighbors in the apartment (Docket No. 10, pp. 279 of 464).

In the second hypothetical, the ALJ added this additional limitation:

who was limited to simple, routine, low-stress tasks, where there is no requirement for arbitration, negotiation, confrontation, directing the work of others or being responsible for the safety of others.

(Docket No. 10, pp. 61-62 of 464).

These skills did not transfer to work that the second hypothetical worker could perform (Docket No. 10, p. 63 of 464).

## IV. EDUCATIONAL BACKGROUND.

The permanent records from the public secondary schools in Cleveland, Ohio, showed that at the conclusion of Plaintiff's sixth grade year in October 1967, her ACHIEVEMENT TEST results showed a score that placed her between third and fourth grade proficiency.  During her final year of school in June 1971, Plaintiff earned these grades:

1.  English             C
2.  Social Studies      F
3.  Science             F
4.  Typing              D+
5.  Home Economics      F
6.  Health              F
7.  Physical Education  D

(Docket No. 10, p. 112 of 464).

## V. MEDICAL BACKGROUND.

Plaintiff's medical history and treatment evidence is crucial to assisting the ALJ determine whether she is disabled.  A summary of the sources and treatment follows.

## 1.    THE CLEVELAND CLINIC

| | |
|---|---|
| September 2, 1994 | Dr. Joseph Crowe, M. D., performed a biopsy of the right breast mass and abscess (Docket No. 10, p. 195 of 464). |
| January 22, 1997 | Since the previous examination, there had been interval enlargement of the subcutaneous tissues of the left buttock and lateral and anterior thigh (Docket No. 10, pp. 213-216 of 464). |

| | |
|---|---|
| March 11, 1997 | Results from the computed tomography (CT scan) results showed a mildly enlarged cardiac silhouette (Docket No. 10, p. 210 of 464). |
| July 8, 1997 | Plaintiff presented with abdominal pain and the radiographic view of her abdomen showed gas scattered throughout the small and large bowel.  There were small calcifications which overlay the mid-portion of the medial aspect of the right kidney (Docket No. 10, p. 205 of 464). |
| July 18, 1997 | The CT scan taken of Plaintiff's chest showed pericardial thickening.  Atelectasis (decreased or absent air in the entire or part of the lung) versus fibrosis lung bases was detected on a recent radiograph (Docket No. 10, p. 203 of 464; STEDMAN'S MEDICAL DICTIONARY 36120 (27th ed. 2000)). |
| August 1, 1997 | Film from Plaintiff's abdomen showed multiple small right sided renal calculi (Docket No. 10, p. 202 of 464). |
| August 20, 1997 | Results from an X-ray of Plaintiff's left ankle showed no acute fracture or dislocation.  Some degenerative change about the ankle characterized by joint space narrowing and bone spur formation was noted (Docket No. 10, p. 201 of 464). |
| April 10, 2003 | Results from an X-ray of Plaintiff's left knee were normal.  Results from X-ray of Plaintiff's left ankle showed marked degenerative changes about the ankle (Docket No. 10, pp. 197-200 of 464). |
| May 20, 2008 | Plaintiff was seen on a one-time internal medical disability examination.  Dr. Paras determined that Plaintiff's main problem was the pain in her lower extremities which limited her ability to ambulate well.  He observed that Plaintiff was depressed with anxiety (Docket No. 10, pp. 279-280, 282- of 464).  In addition, he opined that Plaintiff's range of motion in her cervical spine, shoulders, elbows, wrists, hands/fingers, hips and knees were within the normal ranges.  The range of motion in her dorsolumbar spine and left ankle was abnormal (Docket No. 10, pp. 283-286 of 434). |

### 2.    ST. VINCENT CHARITY HOSPITAL AND HEALTH CENTER.

| | |
|---|---|
| November 3, 2003 | Plaintiff complained of chest pain and dyspnea.  An infiltrate was detected in her right lower lobe (Docket No. 10, p. 245 of 464). |
| March 22, 2006 | Plaintiff had a cough which produced yellow phlegm.  Medication was used to treat what was considered an upper respiratory infection (Docket No. 10, pp. 240-241 of 464). |
| September 20, 2006 | Plaintiff was treated for dyspnea.  The cardiac shadow was unremarkable.  The attending physician suspected mild atelectatic change and/or scarring (Docket No. 10, p. 224 of 464). |
| September 30, 2006 | Plaintiff was treated for cold and flu-like symptoms including body aches, diarrhea, wheezing, a cough and abdominal pain.  A radiographic view of her abdomen showed multiple, small calcifications in the right abdomen, suggestive of renal calculi.  The complete cell count showed elevated levels of lipase (an enzyme that catalyzes the formation of fats), and red blood cell distribution width (Docket No. 10, pp. 232-234, 244, 246-247 of 464; STEDMAN'S MEDICAL DICTIONARY 229340 (27th ed. 2000)). |
| August 6, 2007 | Plaintiff was treated for acute bronchitis and seizures.  It was noted that Plaintiff |

6

|  | abused alcohol by history and she had a problem with alcohol intoxication (Docket No. 10, pp. 226-229 of 464). |
|---|---|
| April 13, 2009 | Plaintiff was given antibiotics for acute bronchitis (Docket No. 10, pp. 338-345 of 464). |
| January 11, 2010 | Plaintiff was transported to the hospital by emergency medical services after she had a seizure and admitted for ongoing treatment.  Plaintiff was diagnosed with syncope and seizure, seizure disorder, alcohol abuse, possible alcohol induced seizure and malnutrition.  Her medications were reconciled (Docket No. 10, pp. 434, 444-453 of 464). |
| January 12, 2010 | Dr. Mukul G. Pandit diagnosed Plaintiff with a seizure disorder, alcohol withdrawal, resolved, alcohol dependence and elevated liver enzymes secondary to alcohol abuse.  Although the cardiac panel showed results there within the normal reference range, the radiological view of Plaintiff's heard showed that it was enlarged.  There was a plate of atelectasis in the right lung base.  Treatment included an anti-epileptic and anti-convulsant drugs.  The toxicology examination was negative for illicit drugs (Docket No. 10, pp. 429-431, 460, 461, 464 of 464). |
| January 13, 2010 | Dr. James M. Boyle conducted a medical consultation because in the hospital, Plaintiff developed bright red rectal bleeding.  Dr. Boyle diagnosed Plaintiff with alcoholic liver disease and he suspected that the rectal bleeding was secondary to hemorrhoids.  He strongly urged Plaintiff to discontinue alcohol and smoking and he recommended a colonoscopy (Docket No. 10, p. 432 of 464). |
| January 14, 2010 | At the time of discharge, Plaintiff's red cell distribution width, some white blood cell levels, bilirubin levels and ketone levels were all elevated.  Her glucose levels were normal and her uric acid appearance was abnormal (Docket No. 10, pp. 458-459 of 464). |
| September 29, 2010 | Plaintiff presented to the emergency room with severe leg pain and dizziness.  Plaintiff's medications for seizures and osteoarthritis were reconciled.   The radiological view of the chest when compared to the view taken on January 12, 2010 showed an enlarged cardiac silhouette.  There was no focal consolidation (Docket No. 10, pp. 436-443, 454-457, 463 of 464). |

3.    UNIVERSITY HOSPITAL.

| March 21, 2008 | Plaintiff was diagnosed with advanced osteoarthritis of the left ankle (Docket No. 10, p. 251 of 464). |
|---|---|

4.    MERIDIA SOUTH POINTE HOSPITAL.

| May 20, 2008 | Plaintiff presented for treatment of left ankle pain.  Marked degenerative changes in her ankle were detected, evidenced by the presence of decreased calcification or density of bone or reduced bone mass (Docket No. 10, p. 278 of 464; STEDMAN'S MEDICAL DICTIONARY 289180 (27th ed. 2000)). |
|---|---|

5.    METROHEALTH MEDICAL CENTER.

| | |
|---|---|
| June 26, 2008 | Plaintiff presented for treatment of a runny nose and teary-eyes.  Dr. Hemalatha C. Senthilkumar diagnosed Plaintiff with allergic rhinitis, depressive disorder, nicotine abuse, alcohol dependence, menopausal symptoms and pain in her ankles and hips (Docket No. 10, pp. 333-336 of 462). |
| July 22, 2008 | Dr. Christine A. Alexander, a teaching physician, diagnosed Plaintiff with and treated her for joint pain in the ankle/foot, nicotine abuse and depressive disorder (Docket No. 10, pp. 329-332 of 464). |
| September 15, 2008 | Dr. Wayne A. Forde, M. D., a treating physician, conducted a review of Plaintiff's medical history and physical examination, after which he diagnosed Plaintiff with an ankle sprain (Docket No. 10, pp. 298-302 of 464). |
| September 23, 2008 | Plaintiff was treated for tooth pain.  No other emergency medical condition was identified (Docket No. 10, pp. 303-316 of 464). |
| November 25, 2008 | Plaintiff underwent a digital radiograph to decreased calcification or bone mass.  The results showed the presence of osteoporosis (Docket No. 10, pp. 320-321 of 464; STEDMAN'S MEDICAL DICTIONARY 289180 (27th ed. 2000)). |
| March 19, 2009 | Dr. Sumita Aggarwal detected blood in Plaintiff's stool and symptoms of positional vertigo were detected (Docket No. 10, pp. 383-384 of 464). |
| March 19, 2009 | Dr. Aphrodite Papadakis, a teaching physician, agreed with Dr. Aggarwal's plan to obtain a colonoscopy, an ophthalmology examination and stress echocardiogram (Docket No. 10, p. 384 of 464). |
| April 9, 2009 | Dr. Papadakis opined that Plaintiff had osteoporosis, epilepsy, hyperlipidemia, vertigo, ankle and foot pain and reflux esophagitis.  The same level of therapy was continued (Docket No. 10, p. 380 of 464). |
| July 23, 2009 | Plaintiff presented for treatment of pain and swelling in her legs and feet bilaterally and cramps in her hands *inter alia*.  Adding to the list of other impairments, Dr. Michael Louis Raddock diagnosed Plaintiff with reflux esophagitis and pure hypercholesterolemia.  He suggested that Plaintiff "stay the course" with her medications and he counseled Plaintiff on the importance of smoking and drinking cessation and home exercises as a key to her health improvement (Docket No. 10, pp. 373-379 of 464). |
| August 9, 2009 | Plaintiff complained of dyspnea.  Because Plaintiff had chronic bronchitis, she was admitted to the hospital for treatment of suspected exacerbated chronic obstructive pulmonary disease.  Diagnostic tests revealed compression of the mid-thoracic spine vertebral bodies (Docket No. 10, p. 359-369 of 464). |
| August 12, 2009 | Posterior and lateral images of Plaintiff's chest showed an enlarged cardiac silhouette, prominent band-like atelectasis at the right lung base, which represented a change from the prior examination and atherosclerotic calcifications were seen in the aortic knob.  Plaintiff was diagnosed with bilateral scarring and/or atelectasis (Docket No. 10, pp. 353-359 of 464). |
| October 21, 2009 | Plaintiff presented for a refill on medication, reporting that she had some pain and swelling in her right foot.  She was diagnosed with pneumonia.  A complete review of medications dispensed by Rite Aid Pharmacy was conducted.  Then the medication regimen was adjusted to assist with overall resolution of joint pain (Docket No. 10, p. 346-349, 385-422, 424 of 464). |
| September 29, 2010 | Plaintiff presented with complaints of dizziness.  The computed tomography of her |

8

brain showed no acute intracranial bleeding, focal mass effect or hydrocephalus and no large vessel infarct. There was skull thickening (Docket No. 10, p. 428 of 464).

6.    **CONSULTATIVE EXAMINATIONS.**

A.    **DR. SALLY FELKER, PH. D., PSYCHOLOGIST.**

On April 11, 2008, Dr. Felker conducted a clinical interview during which she administered the Wechsler Adult Intelligence Scale-III. Results from the test revealed a full scale intelligence quotient (IQ) of 70, a verbal IQ of 72 and a performance IQ of 73. These results placed Plaintiff at the low borderline range of adult intellectual functioning (Docket No. 10, pp. 255-256, 257 of 464). Dr. Felker diagnosed Plaintiff with alcohol dependence, depression, unspecified type, borderline intellectual functioning (BIF) and psychosocial stressors. She subjectively rated Plaintiff's social, occupational and psychological functioning as within the moderate range based on symptom severity. Suspecting that Plaintiff was depressed, Plaintiff had moderate symptoms or moderate difficulties in social, occupational or school functioning (Docket No. 10, p. 256 of 464).

B.    **THE PSYCHIATRIC REVIEW TECHNIQUE.**

Dr. Tonnie Hoyle, Psy. D., determined on May 19, 2008, that there was sufficient documentation of factors that evidence medically determinable impairments, namely, depression of an unspecified type, BIF and alcohol dependence (Docket No. 10, p. 260-268 of 464). It was Dr. Hoyle's opinion that Plaintiff had a mild degree of limitation in the functional limitations of restriction of activities in daily living and difficulties in maintaining social functioning. However, Plaintiff had a moderate degree of limitation in maintaining concentration, persistence or pace. There was no evidence that a previously working structure or system was functionally deteriorating (Docket No. 10, p. 270 of 464).

On November 4, 2008, Dr. Vicki Casterline, Ph.D., conducted a case analysis. Having reviewed all of the evidence in the record, she affirmed as written Dr. Hoyle's opinions (Docket No. 10, p. 308 of

464).  **C.**    **THE MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT.**

Dr. Hoyle considered the summary conclusions from the evidence in the file and entered specific ratings on Plaintiff's ability to sustain each mental activity over a normal workday and workweek.  Dr. Hoyle found that Plaintiff would have moderate limitations in the ability to:

1.    Carry out detailed instructions;
2.    Maintain attention and concentration for extended periods;
3.    Complete a normal workweek and workday without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and
4.    Respond appropriately to changes in the work setting.

Dr. Hoyle found Plaintiff's statements credible.  Her reported symptoms and limits were mostly consistent with the evidence, although there was no evidence of any significant memory problems (Docket No. 10, pp. 274-276 of 464).

**D.**    **PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT.**

Based on all of the evidence in the file, Dr. Charles Derrow, M. D., concluded on June 19, 2008, that Plaintiff:

1.    could occasionally lift and/or carry twenty pounds;
2.    could frequently lift and/or carry ten pounds;
3.    could stand and/or walk for about six hours in an eight-hour workday;
4.    could push and/or pull except as limited in her lower extremities;
5.    could occasionally climb using a ramp or stairs;
6.    could never balance;
7.    had no manipulative limitations;
8.    had no environmental limitations;
9.    had no visual limitations; and
10. had no communicative limitations.

In conclusion, Plaintiff's allegations were partially credible.  She had a left ankle impairment that could reasonably be expected to produce limitations.  However, Plaintiff was inconsistent with the report of her last seizure.  Overall, her seizure reports are exaggerated and/or not backed by medical evidence

(Docket No. 10, pp. 288-293 of 464).

There was no new medical evidence for review as of November 27, 2008. Accordingly, W. Jerry McCloud, M. D., affirmed Dr. Derrow's report of June 19, 2008 (Docket No. 10, p. 337 of 464).

### VI. STANDARDS OF ELIGIBILITY.

#### 1. DIB AND SSI.

DIB and SSI are available only for those who have a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); *See also* 20 C.F.R. § 416.920)). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id*. (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context)). The Commissioner's regulations governing the evaluation of disability for DIB and SSI--20 C.F.R. § 404.1520, and 20 C.F.R. § 416.920, respectively, are identical for purposes of analysis so to assist clarity, the remainder of this decision refers only to the DIB regulations, except where otherwise indicated. To determine disability under Sections 404.1520 and 416.920, a plaintiff must first demonstrate that he or she is not currently engaged in "substantial gainful activity" at the time her or she seeks disability benefits. *Id*. (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability. *Id*. A "severe impairment" is one which "significantly limits the claimant's physical or mental ability to do basic work activities. *Id*.

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is

11

presumed to be disabled regardless of age, education or work experience. *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled. *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001)(internal citations omitted) (second alteration in original)).  If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates. *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

**2.      DWB.**

DWB as used in the Act is defined at 42 U. S. C. § 402(e).  To qualify for DWB, a claimant must be unmarried; between the ages of fifty and sixty; be the spouse of a wage earner who dies fully insured; file an application for such benefits; and be under a disability as defined in the Social Security Act. *Lambert ex rel. Lambert v. Commissioner of Social Security*,  2012 WL 966060, *9 (S. D. Ohio, 2012) (*citing* 42 U.S.C. § 402(e)).  To establish disability, a claimant for disabled WIB must prove that he or she suffers from a physical or mental impairment of such severity as to prevent the claimant from engaging in his or her previous work and, considering the claimant's age, education, and work experience, any other kind of substantial gainful work that exists in the national economy. *Id.* (*citing* 42 U.S.C. § 423(d)(2)(A)).

The surviving spouse will be adjudged disabled if he or she suffers from a medically determinable impairment which meets the durational requirement.  20 C. F. R. § 404.1577 (Thomson Reuters 2012).  As long as she or he is not working, the claimant can establish the required degree of severity of impairment by presenting clinical findings that are the same as those of an impairment listed in Appendix

12

1 to Subpart P, 20 C. F. R. Part 404, or from one or more unlisted impairments that singly or in combination are the medical equivalent of a listed impairment. 20 C. F. R. § 404.1577 (Thomson Reuters 2012).

Plaintiff's application for WIB alleges that she is an unmarried widow, between the ages of fifty and sixty and that her spouse died fully insured. Contemporaneously with the application for WIB, Plaintiff filed an application for DIB, claiming that she was under a disability as defined by the Act.

To be eligible for DIB, a claimant must be under a "disability" as defined under the Act. *Ridge v. Barnhart*, 232 F. Supp.2d 775, 785 (N.D.Ohio,2002) (*see* 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A)). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A)). In applying this standard, the Commissioner has promulgated regulations setting forth a five-step sequential evaluation process. *Id.* (*see* 20 C.F.R. §§ 404.1520 and 406.920). An ALJ must proceed through the required sequential steps for evaluating entitlement to DIB. *Id.* The Sixth Circuit has summarized the steps as follows:

1. If the claimant is doing substantial gainful activity, he or she is not disabled.
2. If the claimant is not doing substantial gainful activity, his or her impairment must be severe before he or she can be found to be disabled.
3. If the claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his or her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
4. If the claimant's impairment does not prevent him or her from doing his or her past relevant work, he or she is not disabled.
5. Even if the claimant's impairment does prevent him or her from doing his or her past relevant work, if other work exists in the national economy that accommodates his or her residual functional capacity and vocational factors (age, education, skills, etc.), he or she is not disabled.

13

*Id.* at 785-786 (*citing Lyons v. Social Security Administration*, 19 Fed.Appx. 294, 2001 WL 1110110, *5 (6th Cir.2001), unpublished (*citing Walters v. Commissioner of Social Security*, 127 F.3d 525, 529 (6th Cir.1997), and 20 C.F.R. § 404.1520(b)-(f)).  The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at step five to show that alternate jobs in the economy are available to the claimant, considering his or her age, education, past work experience and residual functional capacity. *Id.* (*see Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir.1990)).

## VII.  ALJ DETERMINATIONS

After consideration of the entire record, the ALJ made these findings:

1. Plaintiff did not meet the insured status requirements set forth in Section 216(i) of the Social Security Act (Act).

2. Plaintiff was an unmarried widow of the deceased insured worker and had attained the age of 50 years.  She met the non-disability requirements for disabled widows' benefits as set forth in Section 202(e) of the Act.

3. The prescribed period ended on August 31, 2008.  Plaintiff engaged in substantial gainful activity from January 1998 through December 1998.

4. There were continuous 12-month periods during which Plaintiff did not engage in substantial gainful activity.  The remaining findings address the periods that Plaintiff did not engage in substantial gainful activity.

5. Plaintiff had the following severe impairments:  osteoarthritis of the left ankle, chronic obstructive pulmonary disease, and an alcohol abuse disorder with depression and cognitive impairment.

6. Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments of 20 C. F. R. 404, Subpart P, Appendix 1.

7. Considering the alcohol abuse and related disorders since the alleged onset date, Plaintiff had the residual functional capacity to do a range of work activity of sedentary work.  Specifically, she could lift, carry, push and/or pull a maximum of ten pounds frequently, sit for six hours and could stand and/or walk for two hours in an eight-hour workday with normal breaks.  She could never use ladders, ropes or scaffolds and could occasionally use stairs or ramps, stoop, kneel, crouch and crawl.  Plaintiff was limited to simple, routine, repetitive tasks.  She was precluded from work in a high-stress environment and from tasks that required negotiation, arbitration,

14

confrontation or being responsible for the safety of others.  These nonexertional limitations reduced the range of sedentary work that Plaintiff could perform.  Beginning on March 7, 1996, Plaintiff lacked the capacity to perform work requiring concentrated exposure to fumes, dust, odors, gases or other pulmonary irritants or poorly ventilated areas.  This limitation did not further erode the occupational base of sedentary work.

8.  Plaintiff was capable of performing her past relevant work as a front desk receptionist.  This work did not require the performance of work-related activities precluded by her residual functional capacity.

9.  Plaintiff was born on October 3, 1955 and she was 31 years of age, a younger person aged 18-44 as defined in the Act, on November 15, 1996, the date she alleged her disability began.  On October 2, 2000, she attained the age of 45, a younger person age 45-49, as defined in the Act, and on October 2, 2005, she attained the age of 50, becoming a person approaching advanced age as defined in the Act, and on October 2, 2010, she attained the age of 55, a person of advanced age as defined in the Act.

10. Plaintiff had a limited education and was able to communicate in English.

11. Plaintiff's acquired job skills did not transfer to other occupations within the residual functional capacity described above.

12. Considering Plaintiff's age, education, work experience and residual functional capacity based on all the impairments, including her alcohol abuse and related disorder, there were no jobs that existed in significant numbers in the national economy that she could perform.

13. If Plaintiff stopped abusing alcohol, her remaining limitations would still cause more than a minimal limitation on her ability to perform basic work activities; therefore, Plaintiff could continue to have a severe impairment or combination of impairments.

14. If Plaintiff stopped abusing alcohol, she would still not have an impairment or combination of impairments that met or medically equaled any of the impairments listed in 20 C. F. R.  Part 404, Subpart P, Appendix 1.

15. If Plaintiff stopped abusing alcohol, since the alleged onset date, she retained the residual functional capacity to do a range of sedentary work.  Specifically, she could lift, carry, push and/or pull a maximum of ten pounds frequently, sit for six hours and could stand and/or walk for two hours in an eight-hour workday with normal breaks.  She could never use ladders, ropes or scaffolds and could occasionally use stairs or ramps, stoop, kneel, crouch and crawl.  These nonexertional limitations reduced the range of sedentary work that Plaintiff could perform.  Beginning March 7, 1996, Plaintiff lacked the capacity to perform work requiring concentrated exposure to fumes, dust, odors, gases or other pulmonary irritants or poorly ventilated areas.  This limitation did not further erode the occupational base of sedentary work.

15

16. If Plaintiff stopped abusing alcohol, she would be able to perform past relevant work as a desk receptionist.  This work did not require the performance of work-related activities precluded by the residual functional capacity Plaintiff would have if she stopped abusing alcohol.

17. Plaintiff would not be disabled if she stopped abusing alcohol, because she would then have the capacity to return to her past relevant work.  Her alcohol abuse was therefore a contributing factor material to the determination of disability.

18. Because she performed substantial gainful activity from January 1, 1998 through December 31, 1998, Plaintiff was not disabled within the meaning of the Act during calendar year 1998. Because Plaintiff retained the capacity to return to her past relevant work, she had not been disabled within the meaning of the Act at any time from the alleged onset date through the date of the decision.  In the alternative, Plaintiff's alcohol abuse disorder is a contributing factor material to the determination of disability and Plaintiff has therefore not been disabled within the meaning of the Act at any time from the alleged onset date through the date of this decision.

19. Based on the application for the period of disability and DIB filed on March 21, 2008, Plaintiff did not meet the insured status requirements under Section 216(d) if the Act.

20. Based on the application for disabled widows' benefits filed on March 21, 2008, Plaintiff was not disabled under Section 202(e) and 223(d) of the Act.

21. Based on the application for SSI filed on February 5, 2008, Plaintiff is not disabled under Section 1614(a)(3)(A) of the Act.

(Docket No. 10, pp. 13-37 of 464).

### VIII.  STANDARD TO REVIEW OF THE COMMISSIONER'S DECISION.

The district court exercises jurisdiction over the review of the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832 (6th Cir. 2006).  In reviewing the Commissioner's decision, the court must only determine whether substantial evidence in the record supports the finding, and whether the ALJ applied the proper legal standards in reaching his or her decision.  *Stoker v. Commissioner of Social Security,* 2008 WL 1775414, *3 (N. D. Ohio 2008) (*citing* 42 U.S.C. § 405(g); *Brainard v. Secretary of Health & Human Service*s, 889 F.2d 679, 681 (6th Cir. 1989); *Richardson v. Perales,* 91 S. Ct. 1420, 1427 (1971)).  The court "may not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility."

*Id.* (*citing Cutlip v. Secretary of Health & Human Services,* 25 F.3d 284, 286 (6th Cir. 1994); *Richardson, supra,* 91 S. Ct. at 1427; *Garner v. Heckler,* 745 F.2d 383, 387 (6th Cir. 1984); *Myers v. Richardson,* 471 F.2d 1265, 1266 (6th Cir. 1972)).  If substantial evidence supports it, the court must affirm the ALJ's decision, even if the reviewing court would decide the matter differently.  *Id.* (*citing* 42 U.S.C. § 405(g) (1998); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983)).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (*citing Brainard, supra,* 889 F.2d at 681; *Consolidated Edison Company v. National Labor Relations Board,* 59 S. Ct. 206, 216-217 (1938)).  In determining whether substantial evidence in support exists, the court will view the record as a whole,  *Id.* (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980), and consider anything in the record suggesting otherwise.  *Id.* (*citing Beavers v. Secretary of Health Education and Welfare,* 577 F.2d 383, 387 (6th Cir. 1978)).

## X. DISCUSSION.

Plaintiff presents two issues:
1. The ALJ erred in conducting the "alcoholism analysis."
2. Substantial evidence supports a finding that the combination of Plaintiff's impairments meets 20 C. F. R. Part 404, Subpt. P. Appendix 1, LISTING 12.05(C).

Defendant argues:
1. Plaintiff failed to meet the burden of proving that she was disabled under the Act.
2. Substantial evidence supports the ALJ's finding that Plaintiff could perform her past relevant work
3. Plaintiff failed to provide that she met 12.05 of the LISTING.

### 1. DID THE ALJ APPLY THE CORRECT STANDARD FOR DECIDING IF DRUGS AND/OR ALCOHOL ABUSE WERE MATERIAL TO DETERMINING IF PLAINTIFF WAS DISABLED?

### A. THE ISSUE.

Plaintiff contends that the ALJ failed to first determine whether she was disabled when her substance abuse was taken into account.  Then the ALJ failed to appropriately determine whether the drug

17

or alcohol use was a material contributor to the determination of disability.  Finally, the ALJ failed to

determine whether the substance use was a contributing factor material to the determination of disability.

    **B.  THE LAW.**

In the Contract with America Act of 1996 ("Welfare Reform Act"), Pub.L.No. 104–121, 110 Stat.

847, 852–53 (1996), codified at 42 U.S.C. §§ 423(d)(2)(C) and 1382c(a)(3)(J), Congress amended the

Social Security Act to prohibit the award of benefits to individuals for whom alcoholism or drug addiction

is a contributing factor material to their disability determination.  *Mathews v. Astrue*, 2011 WL 7145221,

*7 (N.D.Ohio,2011) (*citing* 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J)).  The statute provides, in relevant

part:

> An individual shall not be considered to be disabled  . . .  if alcoholism or drug addiction would
> . . .  be a contributing factor material to the Commissioner's determination that the individual is
> disabled.
> *Id.* (*citing* 42 U.S.C. §§ 423(d)(2)(C)).

The Commissioner promulgated regulations which control in determining whether drug addiction

or alcoholism is a contributing factor material to the determination of disability.  20 C.F.R. §§ 404.1535,

416.935).  Those regulations provide:

    (a)    General.  If we find that you are disabled and have medical evidence of your drug addiction
           or alcoholism, we must determine whether your drug addiction or alcoholism is a
           contributing factor material to the determination of disability.

    (b)    Process we will follow when we have medical evidence of your drug addiction or
           alcoholism.

        (1) The key factor we will examine in determining whether drug addiction or alcoholism
            is a contributing factor material to the determination of disability is whether we would
            still find you disabled if you stopped using drugs or alcohol.

        (2)    In making this determination, we will evaluate which of your current physical and
            mental limitations, upon which we based our current disability determination, would
            remain if you stopped using drugs or alcohol and then determine whether any or all
            of your remaining limitations would be disabling.

     (i)  If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.

    (ii)  If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism, and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

To recap, under the statutes and implementing regulations if a claimant is disabled and there is medical evidence of substance abuse, the Commissioner must determine whether the drug addiction or alcoholism is a contributing factor material to the determination of disability. *Mathews, supra*, at *7. If it is, the claimant will be found not to be "disabled" as defined in the Act. *Id.* A finding of disability is a condition precedent to the determination of whether drug addiction or alcoholism is a contributing factor material to the disability determination. *Id.* (*citing* 20 C.F.R. § 416.935). Therefore, in a case where drug addiction or alcoholism is suggested by the evidence, the ALJ must first apply the five-step sequential evaluation process to determine whether a plaintiff's limitations, including consideration of drug addiction or alcoholism, are disabling. *Id.* If so, the ALJ must then assess plaintiff's residual functional capacity limitations which would remain if he or she stopped using drugs or alcohol, and apply the sequential evaluation process a second time to determine whether the limitations assessed would be disabling. *Id.* Ultimately, a person cannot be considered disabled for disability benefit purposes if drug addition or alcoholism is a contributing factor material to the disability finding. *Davenport v. Commissioner of Social Security*, 2012 WL 414821, *10 (E.D.Mich.,2012) (*citing Trent v. Astrue*, 2011 WL 841538, *8 (N.D.Ohio,2011), *Estes v. Barnhart*, 275 F. 3d 722, 725 (8th Cir. 2002); *Brown v. Apfel*, 192 F. 3d 492, 498 (5th Cir. 1999)).

19

### C. PLAINTIFF'S ALCOHOL DEPENDENCE WAS A CONTRIBUTING FACTOR.

At step two, the ALJ found that Plaintiff's history of alcohol abuse was a severe impairment.  The ALJ evaluated which of the current physical and mental limitations upon which the disability determination was based, remained if Plaintiff stopped using drugs and alcohol.  There were no clear periods of abstinence in the record.  Plaintiff admitted that she commenced drinking a fifth of vodka per day as of May 6, 2003 (Docket No. 10, pp. 330, 334 of 464).  While treated for acute bronchitis on August 6, 2007, Dr. Berta M. Briones noted that Plaintiff had problems with alcohol intoxication (Docket No. 10, p. 229 of 464).     Dr. Felker noted in April 11, 2008, that Plaintiff's ability to relate to work peers and

> supervisors as well as tolerate the stress of employment was affected by long term

> alcohol dependence (Docket No. 10, p. 256 of 464).

Dr. Hoyle determined on May 19, 2008, that Plaintiff admitted to drinking three to four times weekly (Docket No. 10, p. 276 of 464).  During the clinical examination by Dr. Paras on May 20, 2008, Plaintiff reported that she quit drinking two years prior but admitted to drinking during the night preceding the examination (Docket No. 10, pp. 279-281 of 464).  Plaintiff admitted on September 15, 2008, September 22 and September 23, 2008, that she quit drinking four years prior but she still sometimes drinks (Docket No. 10, pp. 299, 305, 314, 324, 326 of 464).  Yet on April 19, 2009, Plaintiff presented to St. Vincent with alcohol intoxication (Docket No. 10, pp. 338, 340 of 464).  Again in August 2009, Plaintiff represented that she quit four years earlier but she still drank (Docket No. 10, p. 359 of 464).  In fact, she admitted on or about January 11, 2010, that she was not successful in rehabilitation.  Plaintiff claimed that she always had recurrences of alcohol dependence and she had been drinking heavily recently.  The

attending physician suspected that the alcohol probably induced a seizure (Docket No. 10, pp. 432, 434 of 464). At the hearing on December 17, 2010, Plaintiff appeared after having a drink with breakfast. These examples were persuasive in determining that Plaintiff's use of substances was a contributing factor material to the determination of disability.

After finding that Plaintiff had not engaged in substantial activity since in December 1998, the ALJ established severe impairments of osteoarthritis of the left ankle, chronic obstructive pulmonary disease, alcohol abuse disorder with depression and cognitive impairment. Because the medical evidence showed that Plaintiff never quit drinking, the ALJ applied the sequential process a second time and made a specific finding at steps two and three that if Plaintiff stopped drinking alcohol, her condition would not meet or medically equal any listed impairment. The ALJ then determined whether the remaining limitations would be disabling at steps four and five of the sequential evaluation process.

A thorough review of the decision denying disability shows that the ALJ outlined the relevant applicable law for claimants with impairments connected to alcoholism and in that context, conducted a thorough analysis of the evidence in Plaintiff's case. Using the standard five-step approach described in 20 C. F. R. § 404.1520 without segregating the effects that might be due to substance abuse disorders, the ALJ found at step two that Plaintiff's history of alcohol use was a severe impairment (Docket No. 10, p. 20 of 464). Finding that Plaintiff had severe impairments, the regulations dictated that the ALJ determine whether Plaintiff was still disabled independent of the alcohol abuse. The ALJ evaluated which of the current physical and mental limitations would remain if Plaintiff stopped using drugs or alcohol. Of the physical and mental limitations that remained, the ALJ made a determination regarding disability without

considering the effects of Plaintiff's alcohol abuse.  The ALJ concluded that Plaintiff did not have an alcohol abuse-related physical or psychological impairment or combination thereof when the substance abuse stopped.

There is substantial evidence that demonstrates that Plaintiff was afflicted with longstanding alcohol abuse, by history.  The ALJ's approach at reviewing the effects of Plaintiff's alcohol abuse is wholly consistent with the law.  The evidence demonstrates that Plaintiff was a user of alcohol, that her seizures and depression were intertwined with her alcohol use and that alcohol abuse stands in the way of her normal functioning.  The Magistrate finds that substantial evidence on the record as a whole supports the ALJ's conclusion that alcohol was a contributing factor material to the determination of Plaintiff's disability.

### D.  PLAINTIFF'S ALCOHOLISM IS MATERIAL TO THE DETERMINATION OF DISABILITY.

Because the record contains medical evidence of alcoholism, the ALJ was required to apply the sequential evaluation process again to determine which of plaintiff's physical and mental limitations would remain if plaintiff stopped using alcohol.  The ALJ applied the sequential process a second time considering Plaintiff's limitations if she stopped using alcohol (Docket No. 10, p. 33 of 464).  He then determined whether the remaining limitations would be disabling at steps four or five of the sequential evaluation process.

The ALJ acknowledged that the record showed that Plaintiff received treatment for her mental health conditions over the years and she was consistently warned to end her substance abuse.  Plaintiff obtained medical care through various sources, several of whom treated her irregularly and many were not treating physicians who could provide ongoing care over a period of time as contemplated by the

22

regulations.  However, these professionals offered specific opinions regarding the limitations on Plaintiff's ability to work during periods when she was obtaining medical treatment or the extent of improvement of his symptoms during such periods when she was not receiving medical treatment.  In these cases, there was only documented evidence of a slight abnormality or a combination of slight abnormalities that would have an impact on Plaintiff's ability to work.

It is apparent from his decision that the ALJ complied with the regulatory requirements, properly considered what limitations would remain if Plaintiff were drug and alcohol-free and then articulated his conclusions based on the regulations applied to the facts in this case.  The Magistrate finds that the evidence before the ALJ was adequate to allow him to decide the materiality of Plaintiff's substance disorder and make a reasoned judgment of whether Plaintiff would still be disabled if she were not an alcoholic.  Remand is not warranted since there is substantial evidence in the medical record to support the ALJ's conclusions.

### 2.  IS PLAINTIFF DISABLED UNDER SECTION 12.05(C).

Plaintiff's second claim is simple:  she is mentally retarded, as defined in the Act, because of the evidence in the record that shows cognitive impairment that manifested itself prior to age 22.

### A.  THE REGULATORY FRAMEWORK FOR ESTABLISHING DISABILITY UNDER SECTION 12.05(C).

Under 12.05 of the LISTING, mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.  20 C.F.R. Pt. 404, Subpt. P, App. 1, LISTING 12.05 (Thomson Reuters 2012).  The required level of severity for this disorder can be met when the requirements of C are satisfied:

23

A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. 20 C. F. R. Pt. 404, Subpt. P, App. 1, LISTING 12.05C (Thomson Reuters 2012).

In order to satisfy this diagnostic description, a claimant must prove that he or she meets three factors:  (1) sub-average intellectual functioning; (2) onset before age twenty-two; and (3) adaptive-skills limitations.  *Gonzales v. Astrue,* 2012 WL 711521, *6 (N.D.Ohio,2012) (*citing Hayes v. Commissioner of Social Security*, 357 F. Appx. 672, 675 (6th Cir.2009)).  Although Listing 12.05 does not specifically require a diagnosis of mental retardation, a diagnosis of borderline intellectual functioning is relevant in determining whether a claimant satisfies the diagnostic criteria under Listing 12.05.  *Id.* (*See Cooper v. Commissioner of Social Security*, 217 Fed Appx. 450, 452 (6th Cir.2007) (drawing a distinction between a diagnosis of mental retardation and one of borderline intellectual functioning); *West v. Commissioner of Social Security*, 240 Fed. Appx. 692, 698–699 (6th Cir.2007) (suggesting that a diagnosis of borderline intellectual functioning is relevant when determining whether a claimant has shown deficits in adaptive functioning)).

### B.  RESOLUTION.

Plaintiff fails to point to evidence in the record that satisfies all three factors and there is substantial evidence in the record to support the ALJ's conclusion that she does not meet all three factors.  The ALJ acknowledged that Plaintiff's grades reflected poor performances during her junior high school years. There is no evidence that her classes were part of a mental retardation program or that she was diagnosed as mentally retarded.  Thirty seven years later, Plaintiff was tested and the results from intelligence testing revealed a full scale IQ of 70, a verbal IQ of 72 and a performance IQ of 73.  Based on these scores, Dr. Felker diagnosed her with borderline intellectual functioning, a separate and distinct impairment from the impairment of mental retardation.

24

Even if the ALJ assumed that Plaintiff suffered from sub-average intellectual functioning and deficits in adaptive functioning, there is no indication from which the ALJ could conclude onset before age twenty-two.  Upon consideration of all the evidence, the ALJ reached an appropriate conclusion that Plaintiff suffered from borderline intellectual functioning rather than from mental retardation and that she did not meet Listing 12.05(C).  This finding is supported by substantial evidence.

## XI.  CONCLUSION.

Plaintiff is not entitled WIB, DIB or SSI.  In view of the foregoing, the Magistrate affirms the Commissioner's decision.

**IT IS SO ORDERED.**

<u>/s/Vernelis K. Armstrong</u>
United States Magistrate Judge

Date:   December 21, 2012

25